UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| AMY COOK, derivatively on behalf of CAREER EDUCATION CORP., <br><br> Plaintiff, <br><br> v. <br><br> GARY E. MCCULLOUGH, STEVEN H. LESNIK, LESLIE T. THORNTON, DENNIS H. CHOOKASZIAN, DAVID W. DEVONSHIRE, PATRICK W. GROSS, GREGORY L. JACKSON, MICHAEL J. GRAHAM, THOMAS B. LALLY, BRIAN R. WILLIAMS, THOMAS G. BUDLONG, and THOMAS A. MCNAMARA, <br><br> Defendants, <br><br> and <br><br> CAREER EDUCATION CORP., <br><br> Nominal Defendant. | Case No. 11-CV-9119 <br><br> Judge John W. Darrah |

## MEMORANDUM OPINION AND ORDER

Plaintiff Amy Cook, derivatively on behalf of Career Education Corp. ("CEC"), filed a four-count Verified Shareholder Derivative Complaint against individual Defendants Gary E. McCullough, Steven H. Lesnik, Leslie T. Thornton, Dennis H. Chookaszian, David W. Devonshire, Patrick W. Gross, Gregory L. Jackson, Michael J. Graham, Thomas B. Lally, Thomas A. McNamara, Thomas G. Budlong, and

Brian R. Williams (collectively, the "Defendants"), and against CEC as a nominal defendant. Counts I, II and III of the Complaint allege claims of a breach of Defendants' fiduciary duties as directors and/or officers of CEC, abuse of control, and gross mismanagement. Count IV is a claim against Defendants McCullough, McNamara, Williams, Budlong, and Graham for unjust enrichment.

Defendants move to dismiss all Counts against them for failure to make a demand on the Company's Board, pursuant to Rule 23.1 of the Federal Rules of Civil Procedure ("Rule 23.1"), and for failure to state a claim, pursuant to Federal Rule of Civil Procedure 12(b)(6). A separate motion to dismiss was also filed by Nominal Defendant Career Education Corp: CEC adopts Defendants' arguments.[1] Based on the analysis below, the motions are denied.

## BACKGROUND

The following alleged facts are taken from Plaintiff's Verified Complaint. CEC, a publicly traded Delaware corporation, is a for-profit provider of post-secondary education services in the United States and Europe. (Compl. ¶¶ 54, 56.) CEC operates more than 90 campuses, offering doctoral, masters, bachelors, and associate degrees, and certificate programs in various career-oriented disciplines. (*Id.*) In addition to its physical locations, nearly 40 percent of CEC's approximately 100,000 students attend its web-based virtual campuses. (*Id.*)

---

[1] Additionally, Nominal Defendant CEC moved for an interim stay of discovery because of a pending class-action suit in Illinois: *see Ross v. Career Education Corporation*, No. 12-CV-00276 (N.D. Ill). CEC and two individual defendants are named in the *Ross* case.

Defendant Steven H. Lesnik has been a Director of CEC since 2006, Chairman of the Board since 2008, and served as President and Chief Executive Officer of CEC in November 2011. (Compl. ¶ 25.) Defendant Leslie T. Thornton has been a Director of CEC since 2005, and Thornton currently serves as the Chairperson of the Compliance Committee. (Compl. ¶ 26.) Defendant Dennis H. Chookaszian has been a Director of CEC since 2002 and currently serves as the Chairperson of the Audit Committee and a member of the Compliance Committee. (Compl. ¶ 27.) Defendant David W. Devonshire has been a Director of CEC since 2008 and currently serves as a member of the Audit Committee. (Compl. ¶ 29.) Defendant Patrick W. Gross has been a Director of CEC since 2005 and currently serves as a member of the Audit Committee. (Compl. ¶ 30.) Defendant Gregory L. Jackson has been a director of CEC since 2008 and currently serves on the Compliance Committee. (Compl. ¶ 31.) Defendant Thomas B. Lally has been a Director of CEC since 1998. (Compl. ¶ 32.)

On October 31, 2011, Defendant Gary E. McCullough resigned as President, Chief Executive Officer, and Board Member. (Compl. ¶ 24.) Defendant Thomas A. McNamara joined CEC in February 2001 as Controller and Director of Operations for the International Academy of Design and Technology ("IADT"). (Compl. ¶ 35.) McNamara resigned as Senior Vice President of Art and Design in October 2011, after holding this position since November 2010. (*Id.*) Defendant Brian R. Williams resigned as Senior Vice President of Culinary Arts in October 2011; he began serving in this position in September 2008. (Compl. ¶ 33.) Williams previously served as Vice President of Admissions for American InterContinental University Online from 2006 to 2008. (*Id.*)

3

Defendant Thomas G. Budlong resigned as Senior Vice President of International Operations and Chief Administrative Officer in October 2011. (Compl. ¶ 34.) Defendant Michael J. Graham is, and at all relevant times was, Chief Financial Officer and Executive Vice President of CEC. (Compl. ¶ 28.)

On January 31, 2007, the New York Times reported that the New York State Education Department threatened to close CEC's Katherine Gibbs School in New York City "if certain deficiencies were not corrected." (Compl. ¶ 131(d).) Katherine Gibbs' President, Wynn Blanton, stated that he accepted many of the findings, which were largely based on a peer review conducted the previous summer, but thought some of the findings were "highly subjective, clearly unsubstantiated and objectionable." (*Id.*) Lynne Baker, a CEC spokesperson, told the New York Times that the School had since "implemented substantial changes that directly address its problems." (*Id.*) In June 2007, the SF Weekly wrote an article about the misrepresentation of job prospects at CEC's California Culinary Academy. (Compl. ¶ 131(e).) The article identified eight lawsuits filed against different CEC schools for "misrepresentation and consumer fraud" and "false statements regarding admission criteria and job placement rates." (*Id.*) Since that article, additional class-action lawsuits were filed against CEC schools in California; some are still pending. (Compl. ¶ 73.)

On August 13, 2010, the Department of Education ("DOE") released data, showing that the student loan repayment rate at many of CEC's campuses was below 20 percent. (Compl. ¶ 10.) At CEC's Sanford Brown College-Hazelwood in Missouri, 9 percent of student federal loans were being repaid. (Compl. ¶ 9.) The DOE proposed a

"gainful employment" rule, requiring a for-profit educational provider seeking federal funding to show either: (1) that 45 percent of its former students were paying off principal on school loans or (2) that the debt burden of former students was below 8 percent of their total incomes or below 20 percent of their discretionary incomes. (Compl. ¶ 7.) For-profit education schools that failed to meet the minimum standard would lose federal funding. (*Id.*)

Following this, CEC issued a statement, indicating its intention to work with the DOE and acknowledging that the proposed "gainful employment" rule would affect CEC's Culinary and Art and Design segments. (Compl. ¶ 87.) On November 3, 2010, Defendant McCullough told CEC investors that it was "maintaining and improving upon the compliance culture we developed over the past few years. This includes ensuring students had clear information including the demands of our programs, the range of potential outcomes, and their financial obligations." (Compl. ¶ 90.) Following these statements, CEC's stock price increased. (Compl. ¶ 91.)

CEC's American schools derive 82 percent of tuition revenue from federal funding under Title IV of the Higher Education Act, 20 U.S.C § 1070, et seq. (Compl. ¶¶ 23, 79-81.) According to the Accrediting Counsel for Independent Colleges and Schools ("ACICS"), to maintain accreditation and to be eligible for Title IV funding, for-profit schools must place 65 percent of graduating students in jobs related to their field of study. (Compl. ¶¶ 11, 18.) Job placement rates below the minimum standard may subject an institution to increased accreditation oversight and other restrictions. (Compl. ¶¶ 14, 18, 108.) "ACICS may also initiate accreditation proceedings such as a show-cause

directive, an action to defer or deny action related to an institution's application for a new grant of accreditation or an action to suspend an institution's accreditation if it fails to meet" the minimum standard. (Compl. ¶ 18.)

In CEC's 2011 10-K form filed with the Security and Exchange Commission ("SEC"), it disclosed, "[i]f any one of our campuses were to lose state authorization, it would be unable to offer educational programs . . . and the lack of Title IV eligibility would likely require us to close a campus." (Compl. ¶ 82.) Further, "[a]ny loss of institutional accreditation would result in a loss of Title IV Program funds for the affected school and its students." (*Id.*)

On November 5, 2010, another CEC school, the Sanford Brown Institute, received notice from the State of Florida Office of the Attorney General that it had commenced an investigation into possible unfair and deceptive trade practices at certain CEC schools for the period from January 1, 2007 to the present. (Compl. ¶¶ 63, 84.) The Florida campus has appeared to comply with the subpoena, providing the documents requested by the Florida Attorney General. (*Id.*) The results of the investigation have not yet been made public. (*Id.*)

Next, on May 17, 2011, CEC received a Subpoena *Duces Tecum* from the Attorney General of the State of New York requesting documents and detailed information about the Company's business practices for the time period May 17, 2005 to the present. (Compl. ¶¶ 85, 95.) The subpoena indicated that the New York Attorney General was investigating whether CEC and its academic institutions complied with New York law. (*Id.*)

On August 3, 2011, CEC admitted some of its campuses were improperly calculating job placement rates. (Compl. ¶ 96.) CEC had discovered the "improper practices" when it prepared its response to the subpoena issued by the New York Attorney General and retained outside independent counsel, Dewey & LeBoeuf LLP, to conduct an internal investigation of CEC institutions. (Id.) CEC's press release stated:

> [The] independent counsel has been directed to review the determination of student placements at all of the company's domestic schools. The company will implement remedial measures based on the results of independent counsel's investigation. Results of the investigation will be reported to the New York Attorney General and other relevant accrediting and governmental bodies, as appropriate . . . We will take all steps necessary to ensure we accurately determine and report placement rates in the future.

(Id.) CEC then issued another statement on the internal investigation, confirming "the existence of improper practices at certain of the Company's Health Education and Art & Design segment schools" and that the previously reported job placement rates "lacked sufficient supporting documentation." (Compl. ¶ 98.) The preliminary results relating to New York schools were reported to the Attorney General of New York. (Id.) Further, the statement announced that CEC, under the direction of its Board of Directors, had "commenced corrective action" and implemented "enhanced controls and procedures" for determining the job-placement rates. All career service employees in CEC's Health Education and Art & Design segment schools were trained on the newly adopted policies and procedures. (Id.)

The Company informed ACICS that for the 2010-2011 reporting period, 13 of CEC's 49 ACICS-accredited Health Education and Art and Design schools met the 65 percent minimum standard for job-placement rates. (Compl. ¶ 98.) On November 14,

7

2011, ACICS issued a "show-cause directive" letter, requiring CEC to show cause as to why current accreditation grants for 49 of its ACICS-accredited institutions in the Health and Art & Design segments should not be withdrawn by way of suspension. (Compl. ¶¶ 14, 18, 108.) The ACICS intended to review "the actions the Company has taken to date to report accurate placement rates and the controls and procedures it has implemented to ensure the accurate determination and reporting of placement rates going forward." (Compl. ¶¶ 18, 108.) The 49 CEC campuses implicated by ACICS represent approximately 40 percent of CEC's revenues. (Compl. ¶ 109.)

Defendants exposed CEC to several lawsuits, which, in turn, "resulted in lower profit margins, declining enrollment, and a tarnished reputation." (Compl. ¶ 16.) On November 2, 2011, Defendant CEO Lesnik spoke to investors, admitting that in the previous quarter, CEC spent approximately $2 million on outside legal fees relating to the New York Attorney General's subpoena requests and $3 million to conduct an internal placement rate review. (Compl. ¶ 105.) Following this, CEC's stock dropped 55 percent, from $15.85 per share to $7.37 per share. (Compl. ¶ 106.)

Defendants breached their fiduciary duties and acted in bad faith, causing CEC to "purposely, recklessly, or negligently" make false statements and concealing that: (1) "[CEC] overstated its growth prospects by engaging in illegal and improper recruiting activities which also artificially inflated [CEC]'s reported results and future growth prospects"; (2) CEC overstated its financial results because the student loan repayment rates and job placement rates at CEC schools were well below the levels required for

8

receipt of federal funding; and (3) "[CEC] failed to maintain adequate systems of internal operational and financial controls." (Compl. ¶¶ 49, 52.)

## LEGAL STANDARD

In reviewing a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), all factual allegations in the complaint are considered, and any reasonable inferences are drawn in the light most favorable to the plaintiff. *Fener v. Gallagher*, No. 04 C 8093, 2005 WL 2234656, at *4 (N.D. Ill. Sept. 8, 2005).

To properly assert a claim in a complaint, the plaintiff must present "a short and plain statement of the claim showing that the pleader is entitled to relief and a demand for the relief sought." Fed. R. Civ. P. 8. A defendant may file a motion to dismiss a claim under Federal Rule 12(b)(6) for failure to state a claim upon which relief may be granted. Rule 8 "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (*Iqbal*) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (*Twombly*)). While a court is to accept all allegations contained in a complaint as true, this principle does not extend to legal conclusions. *Iqbal*, 129 S. Ct. at 1949. To defeat a motion to dismiss under Rule 12(b)(6), a plaintiff must plead sufficient factual matter to state a claim for relief that is "plausible on its face." *Iqbal*, 129 S. Ct. at 1949 (citing *Twombly*, 550 U.S. at 570). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949.

9

To survive a Rule 12(b)(6) motion, a complaint alleging breach of fiduciary duty must plead facts supporting an inference of breach, not simply a conclusion to that effect. *McSparran v. Larson*, Nos. 04-C-0042, 04 C 4778, 2006 WL 2052057, at *2 (N.D. Ill. May 3, 2006) (*McSparran*). Federal Rule of Civil Procedure 23.1 establishes a heightened pleading standard for a shareholder derivative complaint. *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990) (*DiLeo*). The rule requires a plaintiff "to state with particularity: (A) any effort by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members; and (B) the reasons for not obtaining the action or not making the effort." Fed. R. Civ. P. 23.1(b)(3). Pleading with particularity means that the plaintiff must include "the who, what, when, where, and how: the first paragraph of any newspaper story." *DiLeo*, 901 F.2d at 627.

Because CEC was incorporated in Delaware, that state's law controls. *See In re Abbott Laboratories Shareholder Derivative Litigation*, 325 F.3d 795, 803 (7th Cir. 2003) (*Abbott*) (further noting that "Illinois case law follows Delaware law in establishing demand futility requirements . . . ."). A well-established precept of Delaware general corporation law is that directors manage the business affairs of the corporation. *McSparran*, 2006 WL 2052057, at *2. Thus, "by its very nature [a] derivative action impinges on the managerial freedom of directors." *Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 366 (Del. 2006) (*Stone*). A breach of duty may be alleged against a board of directors where a board is liable for either: (1) the poor decisions made by the board of directors or (2) the board of directors' failing to properly

10

monitor the operations of the company. *Abbott*, 325 F.3d 795, 805 (citing *In re Caremark Int'l Inc. Derivative Litigation*, 698 A.2d 959, 967 (Del. Ch. 1996) (*Caremark*)). Therefore, a board of directors might be found to have breached a duty by its poor decision-making and by its failure to act.

A shareholder seeking to bring a lawsuit on behalf of a corporation must either make a pre-suit demand on the board of directors or otherwise establish that demand is excused "because the directors are incapable of making an impartial decision regarding whether to institute such litigation." *Stone*, 911 A.2d at 367. "The purpose of the demand requirement is to afford the directors an opportunity to exercise their reasonable business judgment and waive a legal right vested in the corporation in the belief that its best interests will be promoted by not insisting on such right." *Kamen v. Kemper Fin. Servs. Inc.*, 500 U.S 90, 96 (1991) (*Kamen*). However, the pre-suit demand requirement is excused when a demand would be futile. *Kamen*, 500 U.S. at 102. While Fed. R. Civ. P. 23.1 requires a plaintiff to allege its efforts to make a demand with particularity, "the requirement of a shareholder demand is more than a pleading requirement, it is a substantive right of the shareholder and the directors." *Abbott*, 325 F.3d at 803-804 (citing *Kamen*, 500 U.S. at 97). Delaware law "controls these substantive rights and governs what excuses are adequate for failure to make demand." *Id.*

## ANALYSIS

Though Plaintiff does not characterize it as such, she appears to pursue a *Caremark* claim: a derivative claim, alleging a board's failure to exercise corporate oversight. *Caremark*, 698 A.2d at 967. The court in *Caremark* characterized such a

claim as "possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment." *Id.* at 967. Defendants argue Plaintiff's Complaint should be dismissed for lack of a pre-suit demand on CEC's Board of Directors. Plaintiff's defense for her failure to make a pre-suit demand is that any such demand would have been futile.

Delaware law is applicable in determining if Plaintiff is excused from making a demand upon CEC's Board of Directors prior to filing a derivative suit. *See Kamen*, 500 U.S. at 98-99. Under Delaware law, a pre-suit demand is only excused when "facts are alleged with particularity which create a reasonable doubt that the directors' action was entitled to the protection of the business judgment rule." *Aronson v. Lewis*, 473 A.2d 805, 808 (Del. 1984) (*Aronson*), overruled on other grounds by *Brehm v. Eisner*, 746 A.2d 244, 253 (Del. 2000).[2]

In *Aronson*, the Delaware Supreme Court established a two-prong test to assess demand futility. 473 A.2d at 814. The test determines whether the alleged particularized facts create a reasonable doubt that: "(1) the directors are disinterested or independent and (2) the challenged transaction was otherwise the product of a valid exercise of business judgment." *Id.* "Hence, the Court . . . must make two inquiries, one into the independence and disinterestedness of the directors and the other into the substantive nature of the challenged transaction and the board's approval thereof." *Id.* A plaintiff

---

[2] The business judgment rule provides some protection to corporate boards in their decision-making process; shielding "the deliberations and conclusions of the chosen representatives of the board only if they possess a disinterested independence and do not stand in a dual relation which prevents an unprejudicial exercise of judgment." *Auerbach v. Bennett*, 393 N.E. 2d 994, 1001 (N.Y. 1979).

must state with particularity why a demand is futile; it is insufficient to merely state "in conclusory terms that he made no demand because it would have been futile." *Abbott*, 325 F.3d at 804 (quoting *Starrels v. First Nat'l Bank of Chicago*, 870 F.2d 1168, 1170 (7th Cir. 1989)).

Here, Plaintiff asserts four bases for demand futility: (1) that the Directors were reckless in not establishing adequate controls that complied with accreditation requirements and federal law; (2) that the Directors intentionally caused CEC to disseminate false and misleading information; (3) that, when given the opportunity to investigate the extent of the recruiting violations and the potential loss of accreditation at CEC schools, the Directors commenced an incomplete and "needlessly restricted and ineffective investigation"; and (4) that the Directors have demonstrated their unwillingness to sue themselves, other former executives, and company officers directly responsible for the misconduct. (Compl. ¶¶ 1, 65, 123, 126, 129.) Given these allegations, it is necessary to employ the *Aronson* test to determine if a pre-suit demand made by Plaintiff would have been futile.

*Disinterest or Independence*

"A director is considered interested where he or she will receive a personal financial benefit from a transaction that is not equally shared by the stockholders" or "where a corporate decision will have a materially detrimental impact on a director, but not on the corporation and the stockholders." *Rales v. Blasband*, 634 A.2d 927, 936. (Del. 1993) (citing *Aronson*, 473 A.2d at 812). Plaintiff argues Defendants are interested parties because there was a "substantial likelihood" they would be held personally liable

13

for the alleged misconduct and violation of federal and state laws. (Compl. ¶¶ 124-126.) Plaintiff maintains the Directors would not vote to sue themselves. (Compl. ¶ 126.) However, it is settled Delaware law that "demand is not excused solely because the Directors would be deciding to sue themselves." *In re Citigroup Inc. Shareholder Derivative Litig.*, 964 A.2d 106, 121 (Del. Ch. 2009) (*Citigroup*). "The mere threat of personal liability for approving a questioned transaction, standing alone, is insufficient to challenge either the independence or disinterestedness of directors." *Aronson*, 473 A.2d at 815.

Plaintiff claims CEC's Audit Committee members, in particular, faced a substantial likelihood of liability because those Defendants were obligated to oversee and review CEC's financial reporting, public disclosures, and internal control processes. (Compl. ¶¶ 119-121). "Absent cause for suspicion there is no duty upon the directors to install and operate a corporate system of espionage to ferret out wrongdoing which they have no reason to suspect exists." *Stone*, 911 A.2d at 368 (quoting *Graham v. Allis–Chalmers Mfg. Co.*, 188 A.2d 125, 130 (Del. 1963)). Here, the Complaint adequately pleads a cause for suspicion, based on the multiple media reports, as well as warnings from the DOE and the ACICS. At the pleading stage, Plaintiff need only raise a reasonable doubt as to the disinterestedness of the Board of Directors.

Plaintiff claims the Board of Directors lacked disinterest because it forced Defendants McCullough, Budlong, McNamara, and Williams to resign from CEC due to their involvement in the alleged wrongdoing. (Compl. ¶ 76.) The Directors chose not to file lawsuits against the former executives and thus have failed to protect the Company

14

from further damages. (Compl. ¶ 128.) In addition, Defendants received "unusually large severance agreements" to buy their silence and "to preclude [them from] testifying against the Company." (Compl. ¶ 117.) These facts alleged by Plaintiff support her assertion that the members on the Board of Directors were not disinterested parties.

Plaintiff has pled sufficient facts to establish reasonable doubt as to the Directors' independence. Independence turns on whether "a director is, *for any substantial reason*, incapable of making a decision with only the best interests of the corporation in mind." *McSparran*, 2006 WL 2052057 at *3, (quoting *Parfi Holding AB v. Minor Image Internet, Inc.*, 794 A.2d 1211, 1232 (Del. Ch. 2001) (emphasis in original)). On this basis, it would have been futile for Plaintiff to make a pre-suit demand on Defendants because Plaintiff has established reasonable doubt as to Defendants' independence.

*Business Judgment Rule*

Even if Plaintiff had failed to plead the futility in a pre-suit demand due to Defendants' alleged lack of independence, the second prong of the *Aronson* test would support Plaintiff's claim of pre-suit demand futility. This requires a determination as to whether there is reasonable doubt that the challenged transactions were the product of a valid exercise of business judgment. If reasonable doubt exists, a pre-suit demand by Plaintiff would be deemed futile. *Aronson*, 473 A.2d at 814.

The business judgment rule is "a presumption that directors of a corporation make business decisions on an informed basis, in good faith, and with the honest belief that the course taken was in the best interest of the corporation." *F.D.I.C. ex rel. Wheatland Bank v. Spangler*, 10-CV-04288, 2011 WL 6754022, at *7 (N.D. Ill. Dec. 22, 2011) (quoting

*Ferris Elevator Co., Inc. v. Neffco, Inc.*, 285 Ill. App. 3d 350, 354 (Ill. App. 1996)). At this stage in the proceedings, Plaintiff has the burden of establishing facts that rebut the presumption created by the business judgment rule. *Aronson*, 473 A.2d at 812.

"A sustained or systematic failure of the board to exercise oversight will . . . establish the lack of good faith necessary to establish [director liability]." *Caremark*, 698 A.2d at 971. The Delaware Supreme Court has stated that bad-faith conduct may occur where a director "intentionally acts with a purpose other than that of advancing the best interests of the corporation, where the fiduciary intentionally acts with the intent to violate applicable positive law, or intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties." *In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 67 (Del. 2006). The *Caremark* standard for assessing conduct that results in director-oversight liability has been characterized as a finding that:

> (a) the directors utterly failed to implement any reporting or information system or controls; or (b) having implemented such a system or controls, consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention.

*Stone*, 911 A.2d at 370.

The breach of fiduciary duty claims in this case focus on the latter part of the *Caremark* standard, as they arise from the CEC's Board of Directors' "knowing and culpable violation of their obligations" under the circumstances. (Compl. ¶ 40.) Plaintiff alleges the Directors were aware of state and federal law violations, providing evidence of their direct knowledge through: the 2010 Department of Education data, which showed loan repayment rates at CEC were below 20 percent; annual reporting to the

ACICS; and as members of the Audit and Compliance Committees. (Compl. ¶¶ 8, 9, 18.) Plaintiff claims the Directors recognized that misrepresenting the loan repayment and job-placement rates would jeopardize accreditation at CEC campuses and federal financial aid. (Compl. ¶¶ 82, 83.) Despite this, the Directors purposefully, and with a reckless disregard for their fiduciary duties, caused CEC to release falsified statements. (Compl. ¶ 40.) Defendants acknowledged that the newly proposed, more stringent gainful employment rule would impact CEC's Culinary and Art and Design segments. (Compl. ¶ 87.) An SEC disclosure form stated that for the 2010-2011 reporting period, 52 of CEC's ACICS-accredited Health Education and Art and Design schools had job placement rates below the minimum standard. (Compl. ¶¶ 13, 98.) It may be reasonably inferred that Defendants properly monitored these problems or implemented a plan to correct them.

In support of her argument that the Directors' "conscious disregard" for improper practices on CEC campuses established the lack of good faith necessary to claim director-oversight liability, Plaintiff relies on the Seventh Circuit's opinion in *Abbott*. In *Abbott*, the Seventh Circuit held that there was an intentional "sustained and systematic failure of the board to exercise oversight" because "the directors knew of the violations of law, took no steps in an effort to prevent or remedy the situation, and that failure to take any action for such an inordinate amount of time resulted in substantial corporate losses, establishing a lack of good faith." *Abbott*, 325 F.3d at 809.

Although Defendants here did take some ostensible remedial measures, such as disclosing job-placement and loan-repayment numbers, Plaintiff pleads these remedial

17

efforts are insufficient to avoid futility. (Compl. ¶¶ 87, 90, 98.) The facts alleged establish that CEC's Board of Directors failed to discharge their fiduciary duties in good faith, publicly addressing their reporting problems and seeking to correct those problems. *Caremark*, 698 A.2d at 967.

Plaintiff has alleged particularized facts which would create a reasonable doubt as to whether or not Defendants could have properly exercised sound business judgment in replying to her demand and, therefore, has sufficiently alleged facts to excuse her failure to make a demand of Defendants. Thus, Plaintiff has established a basis to excuse her lack of a pre-suit demand of Defendants, pursuant to Fed. R. Civ. P. 23.1(b)(3).

*Fed. R. Civ. P. 12(b)(6)*

Furthermore, Plaintiff's Verified Complaint survives Defendants' Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(6), as Plaintiff has adequately stated a claim upon which relief may be granted. The detailed facts alleged in Plaintiff's Complaint clearly put Defendants on notice as to what is at issue. Plaintiff has pleaded sufficient facts to state a claim that is plausible on its face; it is facially plausible that Defendants may be liable for the misconduct alleged by Plaintiff, based on the facts alleged. *See Iqbal*, 129 S. Ct. at 1949 (citing *Twombly*, 550 U.S. at 570). Moreover, Defendants' Motions and supporting memoranda fail to clearly address how Plaintiff failed to state a claim, instead focusing almost entirely on the demand futility argument. Therefore, to the extent Defendants move for dismissal of Plaintiff's Complaint under Fed. R. Civ. P. 12(b)(6), this motion is denied.

## CONCLUSION

For the reasons stated above, Defendants' Motion to Dismiss and Nominal Defendant's Motion to Dismiss are denied.

Date: 8-13-12

JOHN W. DARRAH
United States District Court Judge